UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X
DELCO L. CORNETT,

                                        <u>MEMORANDUM AND ORDER</u>


            Plaintiff,

      -against-
                                        Civil Action No.
RICHARD A. BROWN, BERNARD B. KERIK,     04 CV 0754 (DGT) (LB)
CHRISTOPHER JAMISON, PAUL VORBECK,
IRMA SANTIAGO, LEE LINDEN, ROBERT
ERDMAN, WAYNE KAIFLER, JOHN MILLER,
JOHN WHITE, JOHN FRYER, JANE WARREN,
JOHN DONOHUE, JOHN LOWE, JOHN DOE,
and THE CITY OF NEW YORK,

            Defendants.

-------------------------------------X
TRAGER, J.:

      Plaintiff Delco Cornett ("Cornett") has sued the City of New

York ("the City") and numerous individuals[1] pursuant to 42 U.S.C.

§ 1983 and laws of the State of New York alleging claims of false

arrest, malicious prosecution, conspiracy, abuse of process,

seizure of property, and mental anguish that he allegedly

---

      [1] These individual defendants are:  Queens County District
Attorney Richard A. Brown; former Commissioner of the New York
City Police Department Bernard B. Kerik; John Miller and Robert
Erdman, police officers involved in the March 1, 2001 incident;
Deputy Inspector Christopher Jamison and Captain Paul Vorbeck,
whom plaintiff had called to investigate an alleged illegal taxi
business; Irma Santiago, who processed plaintiff's arrest on June
26, 2001, and Lieutenant John White, who authorized the
processing of the June 26 arrest; Lee Linden and John Fryer,
police officers involved in the June 26, 2001 incident; Wayne
Kaifler and John Lowe, police officers involved in the August 16,
2001 incident; and Karen Warren (identified in caption as "Jane
Warren"), John Donohue, and John Doe.  Claims against the
District Attorney and the former Commissioner have been withdrawn
without prejudice.  (<u>See</u> Pl.'s Letter to Hon. Lois Bloom and Hon.
David G. Trager dated Oct. 22, 2004.)

suffered in connection with three "false arrests."  Plaintiff

brought another suit arising from the same nucleus of facts under

Docket No. 02-CV-2493.  That case ended in dismissal of

plaintiff's claims against Brown, Kerik and the City.

Accordingly, plaintiff's claims against those defendants are

dismissed from this case as well, under principles of <u>res</u>

<u>judicata</u>.  The remaining individual defendants in that case were

never served, and the claims against them were dismissed without

prejudice.

In this case, the ten individual defendants who were served

- Vorbeck, Jamison, Linden, Erdman, Kaifler, Miller, Warren,

Lowe, Santiago, White - and the City move for summary judgment on

the grounds that the first alleged false arrest was not, in fact,

an arrest, and that the police had probable cause for the second

and third arrests.  In the instant complaint, although plaintiff

has named Inspector Jamison and Captain Vorbeck in the caption,

he has listed no claims against them.  Accordingly, the complaint

should be dismissed as to these two defendants.


**Background**

The following facts are undisputed and are taken from the

parties' submissions on summary judgment, unless otherwise noted.

Defendants take the bulk of their factual allegations from

plaintiff's deposition testimony, which he does not dispute.

Plaintiff was a paralegal for the late Abraham Hirschfeld
("Hirschfeld"), a colorful real estate mogul who, near the end of
his life, was convicted of trying to hire a hit man to kill a
former business partner.  Before starting his job with
Hirschfeld, plaintiff apparently had no steady residence and had
slept at a variety of locations during the preceding few years.
Hirschfeld operated his firm from a four-floor office building he
owned, located at 328 East 61st Street, New York, New York
("328"), and plaintiff began sleeping at the office.  (Id. ¶ 8;
Pl. Tr. Mar. 10, 2005 at 29.)  After discovering that plaintiff
had been living in his law office, Hirschfeld allowed plaintiff
to sleep on the vacant fourth floor of 328 until plaintiff's
employment with Hirschfeld ended.  (Id.; Pl. Tr. Mar. 10, 2005 at
30.)[2]

At some point during the summer of 2000, Hirschfeld was
incarcerated.  (Pl. Tr. March 10, 2005 at 79.)  At the time of
his incarceration, Hirschfeld owned a co-op apartment in the
Jackson Heights neighborhood of Queens, New York.  (Defs.' Rule
56.1 Stmt. ¶ 12.)  Rather than leave the Jackson Heights
apartment unoccupied for a prolonged period of time, Hirschfeld
reached an agreement with plaintiff whereby plaintiff would use

---

[2] Hirschfeld ultimately sued plaintiff with regard to this
property, and plaintiff had to pay Hirschfeld a fee to settle
that suit.  (Defs.' Rule 56.1 Stmt. ¶ 8.)

3

the apartment as a second residence (in addition to the fourth floor of 328), and his $400 weekly salary would be reduced by $100 per week to serve as plaintiff's rent. (<u>Id.</u>) This agreement, according to plaintiff, was to continue until Hirschfeld's release from prison. (<u>Id.</u>) Plaintiff had a few of his own belongings in the Jackson Heights apartment, including a radio cassette player and a few books. (<u>Id.</u> ¶ 18.) The furnishings in the apartment, including two beds, a sofa bed, a chair, and paintings, belonged to Hirschfeld. (<u>Id.</u> ¶¶ 18, 29.) According to plaintiff, he and Hirschfeld had agreed that plaintiff could keep the property in the apartment, although plaintiff was not required to pay for it. (<u>Id.</u> ¶ 29.)

In September 2000, plaintiff encountered an old acquaintance, Richard Simon, who, unbeknownst to plaintiff, was also known as Richard Anglin. (<u>Id.</u> ¶¶ 14, 15.) Plaintiff had first met Simon in 1997 when a mutual acquaintance provided Simon with plaintiff's name to discuss political campaigns. (<u>Id.</u> ¶ 14.) The two had intermittent contact between 1997 and 2000. (<u>Id.</u>) Upon seeing plaintiff in September 2000, Simon indicated that he did not have a place to live. (<u>Id.</u> ¶ 15.) Plaintiff suggested that Simon could stay at 328 at night. (<u>Id.</u>) No arrangement was made regarding rent at that time. (Pl. Tr. March 10, 2005 at 85.) A week or two later, Simon asked plaintiff if his godson, Erik Gaston, could also stay at the apartment.

4

(Defs.' Rule 56.1 Stmt. ¶ 15.)  Plaintiff agreed.  (<u>Id.</u>)
Plaintiff subsequently allowed Simon and Gaston to move into the
Jackson Heights apartment, and obtained an extra set of keys for
Simon to the Jackson Heights apartment from Hirschfeld's office
manager, although he did not tell the manager for whom the keys
being sought.  (<u>Id.</u> ¶ 16-17.)  In fact, plaintiff never told
Hirschfeld that Simon would be staying at the Jackson Heights
apartment.  (<u>Id.</u> ¶ 16.)

Simon and Gaston lived at the Jackson Heights apartment for
approximately three months without paying rent.  (<u>Id.</u> ¶ 17.)
Simon and Gaston each had his own bedroom; plaintiff slept on the
pull-out sofa when he stayed at the apartment, which was
approximately once per week.  (<u>Id.</u> ¶ 18.)  Plaintiff explained
that he did not sleep at the apartment more frequently because he
did not like to travel to Queens unnecessarily; he worked at 328,
and he could sleep there as well.  (<u>Id.</u>; Pl. Tr. March 10, 2005
at 92.)  The bills for the Jackson Heights apartment were
generally paid by Hirschfeld's office manager, although Gaston
had arranged to turn on cable service and had at least the cable
bill in his name.  (<u>Id.</u> ¶ 19.)  Plaintiff neither received nor
paid for any bills.  (<u>Id.</u>)

In December 2000, plaintiff asked Simon when he expected to
move out.  (<u>Id.</u> ¶ 17.)  Simon asked plaintiff if he could stay
longer, and plaintiff agreed, provided that Simon pay $100 per

week in rent. (Id.) Simon did pay the $100 per week; there was no written rental agreement between Simon and plaintiff. (Id.) Plaintiff claims that he agreed to let Simon stay at the Jackson Heights apartment until February 28, 2001. (Id. ¶ 21.) Simon and plaintiff allegedly arranged to speak at the Jackson Heights apartment on March 1, 2001. (Pl. Tr. March 10, 2005 at 100.)

**(1)**

**March 1-2, 2001**

On March 1, 2001, plaintiff visited Hirschfeld at a correctional facility and, subsequently, went to the Jackson Heights apartment at about 9:00 p.m. (Defs.' Rule 56.1 Stmt. ¶ 20.) Plaintiff watched television until Simon and Gaston arrived. (Id. ¶ 22.) Simon and Gaston were unable to enter the apartment since plaintiff had bolted the door, and neither man had a key to the bolt. (Id. ¶ 22, Pl. Tr. March 10, 2005 at 102.) Plaintiff let Simon and Gaston into the apartment, at which time Simon indicated to plaintiff that he needed more time at the apartment before he could vacate. (Defs.' Rule 56.1 Stmt. ¶ 22.) Simon allegedly offered plaintiff $500 to allow him to stay at the apartment, but plaintiff replied that it was out of his control since Hirschfeld relinquished ownership of the apartment as of February 28, 2001 as part of a lawsuit settlement. (Id. ¶ 22.) Although plaintiff had told Simon to

vacate the apartment, plaintiff himself did not plan to leave, because Hirschfeld had not asked him to move out, and plaintiff believed that he could only be removed by a court order. (Id. ¶ 23.)

Although plaintiff could not recall if Simon asked him to leave the apartment, plaintiff did recall that Simon went to bed but awoke about fifteen minutes later. (Id. ¶ 24.) Simon addressed plaintiff in an animated manner, returned to his bedroom, and called the police at 11:38 p.m. on March 1, 2001.[3] (Id.) Simon then left the apartment, apparently to go to the building's hallway and returned to the apartment with two policemen identified as Robert Erdman and John Miller. (Id.) Plaintiff was unable to recall the appearance of either officer. (Id.) While the record is not entirely clear on this point, it seems that Simon told the police that plaintiff had entered his apartment without authorization. (See id. Ex. G.)

Neither plaintiff nor Simon was able to produce a written lease on the night of March 1, 2001, but Simon was able to produce a cable bill in Gaston's name for the Jackson Heights apartment. (Id. ¶ 26.) Simon told the police that plaintiff did not live at the Jackson Heights apartment but rather lived at 328 East 61st Street. (Id.) Plaintiff admitted that he "ha[d] a

_____

[3] The call-back number for the 911 call was registered to Erik Gaston according to the report apparently obtained from Sprint. (See Defs.' Rule 56.1 Stmt. Ex. E.)

place at 328" but argued that "[t]here is no law that says you can't have two residences." (Pl. Tr. March 10, 2005 at 119.) The officers told plaintiff that he had to leave the premises, and one of the officers indicated that plaintiff should resolve the issue in landlord-tenant court. (Id. at 113-14.) Plaintiff took the names of the officers and protested that the actions of the police were illegal. (Id. at 115.) According to plaintiff, one of the officers threatened to arrest him for burglary if he entered the apartment again, so plaintiff left the premises. (Id.) Plaintiff was not forced to leave the premises physically; at no point was he handcuffed, detained, or taken to the police precinct. (Defs.' Rule 56.1 Stmt. ¶ 27.) Plaintiff suffered no physical harm as a result of this incident, although he does claim financial loss as a result of losing the property in the apartment which was allegedly promised to him by Hirschfeld. (Id. ¶ 29.) During discovery, defendants obtained from the Queens County District Attorney's office a copy of an alleged written lease for the apartment which indicates that Simon is the tenant (Id. ¶ 30); the authenticity of this document is adamantly contested by plaintiff, who calls the document "patently forged." (Pl.'s Counter-Statement Pursuant to Local Civil Rule 56.1 ("Pl.'s Rule 56.1 Stmt.") ¶ 30.)

Plaintiff subsequently submitted a complaint against Officers Erdman and Miller on March 11, 2001. The complaint

consisted of a one-page letter addressed to Inspector Christopher Jamison of the 115th Precinct.  Plaintiff also informed Inspector Jamison of suspected illegal activity by Richard Simon and Eric Gaston by letter dated March 15, 2001.  Plaintiff accused Simon and Gaston of operating an unlicensed car service using cars that were missing front license plates and registration stickers.  In an earlier complaint filed with this court, plaintiff brought claims against Inspector Jamison and Captain Paul Vorbeck for failing to investigate his accusations against Simon and Gaston.  Although plaintiff failed to serve Inspector Jamison and Captain Vorbeck in his earlier complaint, his parallel claims against Queens County District Attorney Richard A. Brown for failure to investigate were dismissed.  Cornett v. Brown, No. 02-CV-2493 (E.D.N.Y. Mar. 31, 2004).

**(2)**

**June 26, 2001**

Plaintiff was summoned to housing court in Queens on June 26, 2001 to testify in a holdover action against Simon and Gaston which was brought by the co-op board of the Jackson Heights apartment building.  (Defs.' Rule 56.1 Stmt. ¶ 31.)  Simon and Gaston were also at the courthouse on June 26.  (Id.)  According to plaintiff, Simon was "very upset," and he was "yelling and screaming."  (Pl. Tr. March 10, 2005 at 125.)  When plaintiff

returned to the courthouse from lunch, he saw Simon on the sidewalk. (Id.) Plaintiff testified that he then saw Simon "dart[ ] back on the [court] plaza." (Id.) Before plaintiff could step onto the plaza, he was approached by two police officers. (Id.) The officers asked plaintiff to identify himself; when he did so, he was told to put his hands behind his back, and he was handcuffed. (Defs.' Rule 56.1 Stmt. ¶ 31.) The attorney for the co-op told plaintiff that he had seen Simon talking to the officers before they arrested plaintiff. (Id.) Plaintiff was taken to the precinct and was released hours later with a ticket/summons charging him with second degree criminal trespass and indicating that he should report to court on a future date (August 1, 2001, to the best of plaintiff's recollection). (Id. ¶ 34; Pl. Tr. March 10, 2005 at 137.)

Records from the New York City police department reflect that on March 23, 2001, Simon had filed a complaint under the name Richard Anglin with the 115th Police Precinct in regard to the March 1, 2001 incident. (Id. ¶ 33.) The arrest worksheet for plaintiff references the March 23 complaint, and further indicates that plaintiff was charged with Second Degree Criminal Trespass for the March 1 incident. (Id. ¶ 35; Defs.' Rule 56.1 Stmt. Ex. H.) Plaintiff also came to discover that the police had a copy of an alleged lease which indicated that Simon was the tenant at the Jackson Heights apartment. (Pl. Tr. March 10, 2005

at 140.)  Plaintiff returned to court as required by the ticket/summons on August 1, 2001, where he was arraigned and released on his own recognizance and condition that he sign an Order of Protection.  (Defs.' Rule 56.1 Stmt. ¶ 37.)  The Order of Protection required that plaintiff "[r]efrain from assault, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats or otherwise interfering with . . . Richard Anglin," but because plaintiff knew that individual only by the name Richard Simon, he claims that he did not know whom was being protected by the order.  (Id.)  Plaintiff later learned that Richard Simon had aliases, one of which was Richard Anglin. (Id.)  The case resulting from plaintiff's June 26 arrest was later dismissed due to the 30.30 speedy trial requirement.[4]  (Id. ¶ 37, Ex. J.)  Plaintiff is claiming no physical injuries as a result of the June 26 incident.  (Id. ¶ 38.)

### (3)

### August 16, 2001

On August 16, 2001, plaintiff was again summoned to court by the co-op to testify against Simon and again saw Simon at the courthouse.  (Id. ¶ 39; Compl. ¶ 37.)  Plaintiff claims that he did not speak to Simon.  (Defs.' Rule 56.1 Stmt. ¶ 39.)  After

---

[4] See N.Y. CRIM. PROC. LAW § 30.30 (McKinney Supp. 2004).

lunch, plaintiff returned to the courthouse, where he saw two police officers. (Id. ¶ 40.) Neither of these officers was involved in either the March 1 or the June 26 incident. Plaintiff approached the officers, who asked plaintiff his name. (Id.) After identifying himself, the officers said that plaintiff would have to accompany them, indicating that "he" (presumably Simon) had a written order of protection. (Id.) Plaintiff was handcuffed and taken to the police station. (Id.)

According to an affidavit by one of the arresting officers, Wayne Kaifler, and the arrest worksheet relating to the August 16, 2001 incident, Simon (referred to in those documents as both Angin and Anglin) told the officers that he had an open case against plaintiff and that at approximately 1:10 p.m., plaintiff said to Simon, in sum and substance: "I don't want you cooperating with the District Attorney people. I don't want you to show up. If the case continues, you are going to get hurt, hurt real bad." (Id. ¶ 41, Ex. K.)

Plaintiff was taken from the precinct to the Queens House of Detention. (Id. ¶ 42.) Plaintiff had been arrested at or about 2:00 p.m. and saw a judge at or about 12:00 a.m. that night. The judge set bail at $1,500. (Id.) Plaintiff was taken back to the Queens House of Detention and was released after approximately five days when Hirschfeld paid the $1,500 bail. (Id.) According to plaintiff, the case was brought before the Grand Jury which

voted no true bill.  (<u>Id.</u>)  Plaintiff is claiming no physical

injuries due to the August 16 incident.  (<u>Id.</u> ¶ 43.)

**Discussion**

**(1)**

**Standard of Review**

Summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  (FED. R. CIV. P.

56(c)).  A genuine issue of material fact exists when "the

evidence is such that a reasonable jury could return a verdict

for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 251 (1986).  For these purposes, a fact is considered

material if "it 'might affect the outcome of the suit under the

governing law.'"  <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 69 (2d

Cir. 2001) (quoting <u>Anderson</u>, 477 U.S. at 248).  If the evidence

is "merely colorable, or is not significantly probative," then

the court must grant summary judgment.  <u>Anderson</u>, 477 U.S. at

249-50.

The party making the motion for summary judgment has the

burden of proving that there is no genuine issue of material

fact.  <u>See</u> <u>Jeffries v. City of New York</u>, 426 F.3d 549, 553 (2d

Cir. 2005).  Moreover, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor."  <u>Id.</u>

In order to prove a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove that he or she was deprived of "any rights, privileges, or immunities secured by the Constitution and laws," and that the deprivation occurred under color of law.  <u>See</u> 42 U.S.C. § 1983 (2000).  For a common law tort to be cognizable under § 1983, it must constitute a violation of the federal constitution or a federal statute.  <u>See</u> <u>Cook v. Sheldon</u>, 41 F.3d 73, 77 (2d Cir. 1994) (affirming denial of summary judgment against troopers for false arrest where there was no probable cause for arrest).  For example, the torts of false arrest and malicious prosecution both implicate rights secured by the Fourteenth Amendment and thus give rise to a § 1983 cause of action.  <u>Id.</u> at 77, 79.  While plaintiff's § 1983 claim falls under federal law, courts look to state law to determine the elements of the underlying tort.  <u>Id.</u> at 79.

**(2)**

**False Arrest Claims**

In order to prove a claim for false arrest, New York law requires the plaintiff to prove four elements:  (1) the defendant intended to confine the plaintiff; (2) the plaintiff was

14

conscious of the confinement; (3) the plaintiff did not consent
to the confinement; and (4) the confinement was not otherwise
privileged.  See Broughton v. State, 37 N.Y.2d 451, 456, 335
N.E.2d 310, 314, 373 N.Y.S.2d 87, 93 (1975); Johnson v. Kings
County Dist. Attorney's Office, 308 A.D.2d 278, 285–86, 763
N.Y.S.2d 635, 641 (2d Dep't 2003).  When an arrest is made
without a warrant, the defendant must show a legal justification
for the arrest, which may be demonstrated through a showing of
probable cause.  Tetreault v. State, 108 A.D.2d 1072, 1073, 485
N.Y.S.2d 864, 865 (3d Dep't 1985).

**a.    March 1, 2001 Incident**

Plaintiff brings his § 1983 cause of action for false arrest
in regard to the March 1, 2001 incident against police officers
John Miller and Robert Erdman.  During that incident, Simon
contacted the police to complain that plaintiff was illegally
inside his apartment.  The police officers instructed the
plaintiff to leave the premises, and one officer suggested that
the plaintiff resolve the matter in landlord-tenant court.  (Pl.
Tr. March 10, 2005 113–14.)  Plaintiff argues that he was "being
confined to the exterior of his apartment."  (Compl. 18.)

To determine whether a plaintiff was confined, New York
courts consider whether a person "in any way restricted [the
plaintiff's] ability to move, or confined him in any way."

15

<u>Carrington v. City of New York</u>, 201 A.D.2d 525, 526, 607 N.Y.S.2d
721, 722 (2d Dep't 1994); <u>see also</u> <u>Kramer v. Herrera</u>, 176 A.D.2d
1241, 1241, 576 N.Y.S.2d 736, 737 (4th Dep't 1991) (noting that
the plaintiff was not confined because she was neither held in
custody nor restricted in her freedom).  As to this incident,
plaintiff is unable to show that he was confined.  Plaintiff was
only told to vacate the premises.  Indeed, in his answering
memorandum, plaintiff concedes that he was not arrested on March
1, 2001.  (Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J.
at 18 ("The police clearly had no basis to arrest plaintiff,
Delco L. Cornett, [on March 1, 2001] or they would have done
so.").)  Plaintiff's cause of action for false arrest against
Officers Miller and Erdman must fail.

**b.    June 26, 2001 Incident**

Plaintiff brings his § 1983 cause of action for false arrest
in regard to the June 26, 2001 incident against police officers
Lee Linden and John Fryer.[5]  During this incident, plaintiff was
handcuffed and held at the police precinct.  (Defs.' Rule 56.1
Stmt. ¶¶ 31, 34.)  Plaintiff also brings claims against police
officer Irma Santiago and Lieutenant Christopher White[6] for

---

[5] Officer Fryer was never served in this action.

[6] Lieutenant White was mistakenly identified as John White
in the complaint.  Service was eventually effected on Christopher
White, who filed an answer and joins defendants' motion.

processing his arrest and authorizing the processing of his arrest, respectively.

It is undisputed that the first three elements of false arrest were met. (See Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. ("Defs.' Mem. of Law") 7.) Officer Linden intended to confine plaintiff, plaintiff was conscious of the confinement and plaintiff did not consent to the confinement. If defendants can show that Linden had probable cause to arrest plaintiff, however, the confinement was otherwise privileged and Linden is not liable. See Dabbs v. State, 59 N.Y.2d 213, 218, 451 N.E.2d 186, 188, 464 N.Y.S.2d 428, 430 (1983); see also Tsachalis v. City of Mount Vernon, 293 A.D.2d 525, 526, 739 N.Y.S.2d 849, 850 (2d Dep't 2002). Probable cause is an absolute defense to fale arrest. Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."); Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

"Probable cause is established 'when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"

Singer, 63 F.3d at 119 (quoting O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir. 1993)). It is not necessary to have evidence beyond a reasonable doubt; in fact, an officer need not show that it was more likely than not that the person arrested committed the prima facie elements of a crime. Miloslavsky v. AES Eng'g Society, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992).

An officer's personal opinion as to whether there was probable cause is irrelevant to a court's determination; a court must assess probable cause objectively. See Maryland v. Pringle, 540 U.S. 366, 371 (2003) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."); Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). In forming an objective assessment, the "[e]vidence . . . must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

Furthermore, while an arresting officer may not disregard information known to him in making an arrest, he is not required "to investigate exculpatory defenses offered by the person being

arrested or to assess the credibility of unverified claims of justification before making an arrest." <u>Jocks v. Tavernier</u>, 316 F.3d 128, 135-36 (2d Cir. 2003); <u>see also</u> <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 128 (2d Cir. 1997) (holding that although the officer would have been entitled to believe the version of events provided by the one arrested, he was not required to do so).

An officer has probable cause to make an arrest if he is advised of a crime by an individual claiming to be the victim of the crime and who has signed a complaint or information charging the individual being arrested with the crime unless there are circumstances which call the alleged victim's truthfulness into question. <u>Singer</u>, 63 F.3d at 119; <u>see also</u> <u>Miloslavsky</u>, 808 F. Supp. at 355 ("[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth."). "The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." <u>Miloslavsky</u>, 808 F. Supp. at 355. Moreover, the arresting officer is not required to investigate the complaining witness's state of mind before making an arrest. <u>Ricciuti</u>, 124 F.3d at 128.

Plaintiff argues that the complaint report filed by Simon on March 23 could not have provided Officer Linden probable cause to

arrest plaintiff on June 23, because the March 23 complaint report was unsigned. Indeed, the form on which the March 23 complaint report is printed contains no signature line or other area where a complainant might sign. (See Decl. of Mary O'Flynn in Supp. of the Defs.' Mot. For Summ. J., Ex. G.) The complaint report does, however, identify Richard Anglin as the victim/complainant, and it accuses "Delco Cornet [sic]" of entering Anglin's apartment on March 1, 2001 without permission. "As a general rule, information provided by an identified citizen accusing another individual of the commission of a specific crime is sufficient to provide the police with probable cause to arrest." Minott v. City of New York, 203 A.D.2d 265, 267, 609 N.Y.S.2d 334, 336 (2d Dep't 1994) (finding probable cause where victim swore out a complaint identifying the plaintiff as her assailant and described in detail the events in question). This general rule is not qualified by a requirement that complaints be sworn or acted upon promptly. To be sure, in the vast majority of warrantless arrests predicated on citizen complaints, the crime was either in progress when the complaint was made or had just taken place, but there does not appear to be a bar to relying on stale complaints in forming probable cause. A victim's delay in reporting a crime may, however, be a factor in evaluating the victim's credibility and, hence, the strength of the complaint in forming a basis for probable cause. See Bullard

<u>v. City of New York</u>, 240 F. Supp. 2d 292, 298 (S.D.N.Y. 2003)
(concluding on motion to dismiss § 1983 claim for false arrest
that victims' delay of several weeks in reporting that plaintiff
allegedly slashed their tires undermined their credibility for
purposes of giving police probable cause to arrest).

In any event, in this instance defendants have submitted no
affidavits or other evidence of what information was available to
Officer Linden at the moment he placed plaintiff under arrest,
but have instead rested their probable cause argument solely on
the March 23 complaint report filed by Simon (using the name
Anglin).  Without any evidence of what, if anything, Simon said
to Linden just prior to the arrest, it is impossible to say
whether Linden had probable cause for the arrest.  Although it is
certainly reasonable to assume that Simon pointed out plaintiff
to Linden and informed Linden of the March 23 complaint report,
such an assumption would amount to an impermissible inference in
favor of the moving party.  Likewise, while it is possible that
the complaint report alone would have given Linden probable cause
to arrest plaintiff, there is no evidence that Linden was
actually aware of the complaint report at the time he made the
arrest.[7]  In sum, by failing to provide any evidence whatsoever

_____

[7] Defendants have not argued for application of the "fellow
officer rule" under New York law, which "provides that even if an
arresting officer lacks personal knowledge sufficient to
establish probable cause, the arrest will be lawful if the
officer 'acts upon the direction of or as a result of

of what information was available to Officer Linden when he

arrested plaintiff at the courthouse, defendants have failed to

carry their burden on summary judgment of showing that Officer

Linden had probable cause to arrest plaintiff on June 26, 2001.

Officer Santiago, on the other hand, completed a "DAT

Report" on June 26, 2001, in which she articulated as her basis

for arrest that Richard Simon (using the name Anglin) spoke

directly to her and "stated that when he returned home to his

apartment [on March 1, 2001] . . . the above defendant was

sitting on his livingroom couch, complainant further stated that

there was no emergency in his apartment and the defendant had no

permission or authority to be there. Complainant stated that

defendant is the agent for the landlord and got the key from the

landlord to enter the apartment." (Pl.'s Answering Aff. in Opp.

---

communication with a superior or fellow officer or another police
department provided that the police as a whole were in possession
of information sufficient to constitute probable cause to make an
arrest.'" People v. Mims, 88 N.Y.2d 99, 113, 666 N.E.2d 207,
215, 643 N.Y.S.2d 502, 510 (1996) (quoting People v. Horowitz,
21 N.Y.2d 55, 60, 233 N.E.2d 453, 286 N.Y.S.2d 473 (1967). Neither
did defendants invoke the "collective knowledge doctrine," which
would, in any event, have been inapplicable. It provides that,
"for the purpose of determining whether an arresting officer had
probable cause to arrest, 'where law enforcement authorities are
cooperating in an investigation, . . . the knowledge of one is
presumed shared by all.'" Savino v. City of New York, 331 F.3d
63, 74 (2d Cir. 2003) (quoting Illinois v. Andreas, 463 U.S. 765,
772 n.5 (1983)). The collective knowledge doctrine is limited to
offers who are working on the same case together, and does not
support the broader proposition "that all information received by
a police department . . . must be imputed to every officer in the
department." United States v. Santa, 180 F.3d 20, 28 (2d Cir.
1999).

to Defs.' Mot. for Summ. J., Ex. N.) Plaintiff argues that the
DAT Report contains inadmissible hearsay and cannot, therefore,
be considered. Officer Santiago's report of what Simon told her
is not offered for the truth of Simon's assertions, however, but
is instead offered to show what information was available to her
when she processed the arrest. Officer Santiago was justified in
relying on the information she received from Simon in processing
plaintiff's arrest. Her role in the June 26 arrest is,
therefore, privileged by probable cause.

Lieutenant White's role in the June 26 arrest is more
problematic. As with Officer Linden, defendants have submitted
no evidence of what information was available to Lieutenant White
when he authorized plaintiff's arrest. In his complaint,
plaintiff describes Lieutenant White's role in his arrest as
follows:

> After being held in the cell for approximately one
> hour a person identified himself as Lieutenant White.
> Defendant White asked plaintiff if he would answer
> some questions. Plaintiff was taken from the cell to
> a table and defendant White said he was surprised
> that defendants Linden and Fryer had placed plaintiff
> under arrest . . . . Plaintiff then informed
> defendant White that he had previously filed a
> complaint regarding the seizure of his apartment
> against defendants Erdman and Miller. Further
> plaintiff spent over an hour explaining what had
> happened to him. Defendant White then started
> yelling at defendant Linden that plaintiff had been
> falsely arrested and that the arrest should by [sic]
> "voided". At that point defendant Linden stated that
> it was necessary to seize plaintiff in order to
> prevent him from giving testimony at the Housing

Court proceeding and that plaintiff's arrest was in
retaliation for filing a complaint against defendants
Erdman and Miller.  Defendant White then said to
plaintiff that even though he had no doubt that
plaintiff had been seized by defendants Linden and
Fryer illegally he was going to authorize his
subordinates to process an arrest of plaintiff on the
grounds that "the housing law in this City is so
complicated it is possible that you may have violated
some law and I will not let you testify at the
Housing Court proceeding" or words to that effect.

(Compl. ¶ 30.)

Lieutenant White denied plaintiff's allegation in his answer

to the complaint.  Plaintiff reiterated his account of Lieutenant

White's role in his June 26 arrest in his deposition, which

defendants attached as an exhibit to their Rule 56.1 Statement:

> A.   In any event Lieutenant White had expected that
>      I would be picked up for questioning, that not I
>      would be arrested [sic] . . . .
> A.   . . . . "You made these claims against Irma [sic
>      - Erdman] and Miller.  We are going to get you."
>      Words to that effect.  I can't recall right now.
> Q.   Who said that?
> A.   Lee Linden because Lieutenant White was saying
>      "This whole thing is not legitimate."  Then Lee
>      Linden came over and said "He filed a complaint
>      against Erdman and Miller."  And so that is the
>      point where Lieutenant White said "I really
>      don't see that you did anything wrong, but we're
>      going to charge you because the housing law is
>      complex.  Maybe you did violate some law."
> Q.   Were you charged with a housing violation?
> A.   No.

(Pl. Tr. March 10, 2005, 140-142.)

Plaintiff's version of the facts demonstrates that

Lieutenant White was aware that he had no probable cause to

authorize plaintiff's arrest.  The only additional evidence in

the summary judgment record explaining why he had probable cause to authorize plaintiff's arrest on June 26, 2001 was submitted by plaintiff. It is the On Line Booking System Arrest Worksheet for plaintiff's June 26 arrest, filled out by hand by Officer Santiago and signed at the bottom by Christopher White as the Reviewing Supervisor. (Pl.'s Answering Aff. in Opp. to Defs.' Mot. for Summ. J., Ex. N.) The Arrest Worksheet reiterates Richard Anglin's (a.k.a. Simon's) complaint that on March 1, 2001 Anglin returned home to find plaintiff sitting on Anglin's living room couch without permission. The Arrest Worksheet would appear to supply Lieutenant White with probable cause for authorizing plaintiff's arrest. Since there are two competing explanations, the evidence concerning Lieutenant White's participation in plaintiff's June 26 arrest leaves questions of fact as to whether Lieutenant White had probable cause for the arrest. Summary judgment is, therefore, denied as to Lieutenant White for the false arrest claim.

### c.  August 16, 2001

Plaintiff brings his § 1983 cause of action for false arrest in regard to the August 16, 2001 incident against police officers Wayne Kaifler and Richard Lowe.[8]  Plaintiff was again handcuffed

---

[8] Plaintiff named "John Lowe" in his complaint; however, service was effected on Richard Lowe, who filed an answer and

and taken to the police precinct as a result of this incident.

The August 16 incident is in some ways analogous to the June 26, 2001 incident. Again, the issue is whether officers Kaifler and Lowe had probable cause to arrest plaintiff. (See Defs.' Mem. of Law 13-14.) In contrast to the June 26 incident, however, for the August 16 incident defendants have supplied some evidence of what information was available to the arresting officers when they made the arrest.

When plaintiff saw Officers Kaifler and Lowe at the courthouse on August 16, he approached them and they told him that Simon had a written Order of Protection. (Defs.' Rule 56.1 Stmt. ¶ 40.)[9] In addition, Officer Kaifler signed an affidavit on August 16, 2001 stating that "Angin" had informed him that he had an open criminal case against plaintiff and that on August 16, 2001, at about 1:10 p.m., in front of 89-17 Sutphin Boulevard, County of Queens, State of New York, plaintiff threatened Simon by stating, "I don't want you cooperating with the District Attorney people. I don't want you to show up. If the case continues you are going to get hurt, hurt real bad."[10]

---

joins defendants' motion.

[9] The officers told plaintiff that "he" had a written Order of Protection. Plaintiff assumed that the officers were referring to Simon. (Defs.' 56.1 Stmt. ¶ 40).

[10] Plaintiff has objected that this statement is "clear and blatant hearsay." The statement is not hearsay, because it is

(Id. ¶ 41; O'Flynn Decl., Ex. K).  It was appropriate for the

arresting officers to accept the truth of Simon's allegations as

long as Simon's truthfulness was not called into question.  See

Singer, 63 F.3d at 119.  Even if there was a mistake of fact and

plaintiff did not threaten Simon on August 16, probable cause may

still exist.  See Bernard v. U.S., 25 F.3d 98, 102 (2d Cir. 1994)

("[P]robable cause can exist even where it is based on mistaken

information, so long as the arresting officer acted reasonably

and in good faith in relying on that information."); see also,

Colon v. City of New York, 60 N.Y.2d 78, 82, 455 N.E.2d 1248,

1250, 468 N.Y.S.2d 453, 455 (1983) (discussing alleged false

arrest based on mistaken identity).[11]

Plaintiff states that on November 16, 2001, the Grand Jury

refused to indict him because it found that there was no probable

cause to arrest plaintiff.  (Pl.'s Mem. of Law 24; Compl. 26.)

Plaintiff is mistaken: the grand jury's refusal to indict is not

_____

not offered for the truth of the matter asserted.  For purposes
of this motion, it does not matter whether the plaintiff actually
threatened Simon; the only issue is whether it was reasonable for
Kaifler to rely on Simon's statement that he had been threatened.

[11] Officers are justified in relying on credible complaints
by citizens in part because false complaints are punishable under
state law.  See N.Y. Penal Law § 240.50 (McKinney 2000); see
also, People v. Crespo, 70 A.D.2d 661, 661, 417 N.Y.S.2d 19, 19
(2d Dep't 1979) ("Unlike a paid or anonymous informant, an
eyewitness victim of a crime can provide probable cause for the
arrest of his assailant despite the fact that his credibility has
not been previously established or his information corroborated.
The victim's reliability is assured because he can be prosecuted
if his report is a fabrication.").

relevant to the question of whether the police had probable cause

to arrest him, because two different standards are at play.  The

grand jury determines whether "the evidence before it is legally

sufficient" to establish that a person committed an offense,

whereas probable cause depends on whether the arresting officer

has "reasonable cause to believe" that a person has committed a

crime."  N.Y. Penal Law § 190.65(1); <u>Camarano v. City of New

York</u>, 646 F. Supp. 246, 250 (S.D.N.Y. 1986).  The New York Court

of Appeals has held that dismissals, acquittals, and reversals of

convictions on appeal are "admissible to refute the affirmative

defense of justification [based on probable cause]."  <u>See</u>

<u>Broughton</u>, 37 N.Y.2d at 458, 335 N.E.2d at 315, 373 N.Y.S.2d at

95.  While such evidence is admissible, it does not necessarily

negate a finding of probable cause.  <u>See</u> <u>Phillips v. Corbin</u>, 132

F.3d 867, 869 (2d Cir. 1997) (holding that the grand jury's

refusal to indict "does not, as a matter of law, establish that

the officers lacked probable cause to arrest"); <u>cf.</u> <u>Taylor v.

City of New York</u>, 269 F. Supp. 2d 68, 73 (E.D.N.Y. 2003) ("[T]he

fact that plaintiff was indicted by the grand jury creates a

presumption that probable cause did exist for purposes of

prosecution, and that presumption can be rebutted only by

evidence of fraud, perjury or deliberate and intentional

suppression of evidence before the grand jury.").

　　　　Plaintiff was subpoenaed to appear in housing court on

August 16, 2001 to testify against Simon in the holdover action brought by the co-op board.  As the subject of the holdover action, Simon was also present at the housing court on August 16. Plaintiff was at that point subject to the order of protection that issued in favor of Richard Anglin as a condition of plaintiff's August 1, 2001 release on his own recognizance. Plaintiff was undoubtedly in a difficult situation as a result of his conflicting obligations under the subpoena and the order of protection, but it is important to note that the order of protection did not prohibit all contact with Simon; rather, it ordered him to refrain from, _inter_ _alia_, intimidating or threatening "Richard Anglin."  According to Officer Kaifler's affidavit, Simon informed Kaifler that he had an open case against plaintiff and that plaintiff had threatened him. Plaintiff denies that he threatened Simon, but does not contest whether Simon made the allegation to Kaifler.  Based on the information available to Kaifler on August 16, the officers had a reasonable basis to believe that plaintiff had committed an offense, thereby giving the officers probable cause.  Thus, the cause of action for false arrest with regard to the August 16 incident must fail.

## Qualified Immunity

In their Memorandum of Law, defendants raise the defense of qualified immunity only in reference to Officers Linden and Santiago, and Lieutenant White (Defs.' Memo. of Law 11-12), so it is only with regard to these defendants that the defense of qualified immunity will be analyzed.

The doctrine of qualified immunity shields from personal liability for damages police officers who engage in official conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, insofar as it was objectively reasonable for such officials to believe, even if mistakenly, that their conduct did not violate such rights." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 127 (2d Cir. 1998) (internal quotations and citations omitted). "The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right." Id. at 128. An arresting officer will be entitled to qualified immunity from a suit for damages even in the absence of probable cause if he can show that there was "arguable probable cause" for the arrest. Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to

believe that probable cause existed, or (b) officers of
reasonable competence could disagree on whether the probable
cause test was met.'" Id. (quoting Golino v. City of New Haven,
950 F.2d 864, 870 (2d Cir. 1991)).  As with the probable cause
inquiry, what is relevant is the officer's knowledge at the time
of the arrest.  Id. at 747-48.

In the case of Officer Linden, defendants have submitted no
information regarding his knowledge at the time of the June 26
arrest.  Although the threshold for qualified immunity is low, it
must be supported by at least some evidence.  As noted, Simon's
statement to Officer Linden which presumably prompted plaintiff's
arrest is not in evidence.  Neither is there any indication
whether Office Linden was aware at the time he made the arrest of
the complaint Simon filed with the police on March 23.  On this
record, it is impossible to determine whether Officer Linden's
actions were reasonable.  Accordingly, summary judgment on
qualified immunity grounds is denied as to Officer Linden.

Officers Santiago's signed DAT Report demonstrates probable
cause for her arrest of plaintiff on June 26, and it also
suffices to demonstrate arguable probable cause.  She has,
therefore, additionally shown that she is entitled to summary
judgment on the basis of qualified immunity for her role in
plaintiff's arrest on June 26.

There are two pieces of evidence concerning Lieutenant

White's knowledge at the time he authorized plaintiff's June 26 arrest. The first is plaintiff's deposition testimony, in which he states that Lieutenant White admitted he did not have probable cause to arrest plaintiff at the time he authorized the arrest. The second is Lieutenant White's signature at the bottom of the June 26 Arrest Worksheet, which sets forth Richard Anglin's complaint that plaintiff had trespassed in his apartment on March 1, 2001. Because there are conflicting versions of the facts that were available to Lieutenant White when he authorized plaintiff's arrest, summary judgment is not appropriate. See McClellan v. Smith, ___ F.3d ___, 2006 WL 436001, at *9-10 (2d Cir. Feb. 24, 2006) ("[R]esolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity.").

### (4)

### Malicious Prosecution

A § 1983 claim for malicious prosecution is grounded on the Fourth Amendment's "right to be free of unreasonable or unwarranted restraints on personal liberty." Singer, 63 F.3d at 116. The restraint on personal liberty "must have been effected 'pursuant to legal process' if it is to support a § 1983 claim." Id. at 116-17 (quoting Heck v. Humphrey, 512 U.S. 477, 484

(1994)).  In the case of a warrantless arrest, the predicate
restraint on liberty can only be based on post-arraignment
deprivations of liberty, because the arrest itself is not
pursuant to legal process.  Id. at 117 ("Typically, a warrantless
deprivation of liberty from the moment of arrest to the time of
arraignment will find its analog in the tort of false arrest,
while the tort of malicious prosecution will implicate post-
arraignment deprivations of liberty.").  Because neither of
plaintiff's arrests (nor the alleged arrest on March 1) were made
pursuant to warrants, the arrests themselves cannot form the
basis of a malicious prosecution claim.

In his Memorandum of Law in Opposition to Defendants' Motion
for Summary Judgment as well as in his Complaint, plaintiff
indicates that he is bringing a cause of action for malicious
prosecution, although he does not allege any factual basis for
the claim or even indicate which of the three incidents a claim
for malicious prosecution would implicate.  (See Pl.'s Mem. at
22-23; Compl. at 6.)

A party bringing a claim for malicious prosecution under New
York law must prove the following elements: "(1) that the
defendant initiated a prosecution against the plaintiff, (2) that
the defendant lacked probable cause to believe the proceeding
could succeed, (3) that the defendant acted with malice, and (4)
that the prosecution was terminated in the plaintiff's favor."

<u>Rohman v. N.Y.C. Transit Auth.</u>, 215 F.3d 208, 215 (2d Cir. 2000)

(quoting <u>Posr v. Court Officer Shield # 207</u>, 180 F.3d 409, 417

(2d Cir. 1999) (internal quotation marks omitted)).  In addition,

for the claim to be cognizable under § 1983, a plaintiff must

allege "that there was (5) a sufficient post-arraignment liberty

restraint to implicate the plaintiff's Fourth Amendment rights."

<u>Rohman</u>, 215 F.3d at 215.

A police officer may be held liable for initiating a

baseless prosecution if he is a "complaining witness" whose false

testimony prompts the prosecution.  See <u>White v. Frank</u>, 855 F.2d

956, 961 (2d Cir. 1988) ("Where . . . the constitutional tort is

the action of a police officer in initiating a baseless

prosecution, his role as a 'complaining witness' renders him

liable to the victim under section 1983. . .."); <u>Llerando-Phipps</u>

<u>v. City of New York</u>, 390 F. Supp. 2d 372, 382 (S.D.N.Y. 2005)

(Ellis, Mag. J.) ("In malicious prosecution cases against police

officers, plaintiffs have met this first element [of showing that

defendants initiated a criminal proceeding] by showing that

officers brought formal charges and had the person arraigned, or

filled out complaining and corroborating affidavits.") (internal

citations omitted).  This is so even where the prosecutor has

independent discretion to decide whether to prosecute, if the

arresting officer "creates false information likely to influence

a jury's decision and forwards that information to prosecutors."

Llerando-Phipps, 390 F. Supp. 2d at 383 (quoting Brome v. City of
New York, No. 02-CV-7184, 2004 WL 502645, at *5-6 (S.D.N.Y. Mar.
15, 2004).

Neither party has detailed in their papers the roles each of
the officers played in plaintiff's prosecutions, but defendants
did submit the criminal court complaint signed and filed by
Officer Santiago on June 29, 2001 in reference to the June 26
arrest and the criminal court complaint signed and filed by
Officer Kaifler on August 16, 2001 in reference to the August 16
arrest.  Because the evidence on summary judgment does not show
that any other defendants played a role in plaintiff's
prosecutions, the malicious prosecution claims will only be
evaluated with respect to Officers Santiago and Kaifler.

Regarding the June 26 arrest, which was purportedly
predicated on the March 1 incident, plaintiff was arraigned and
was subsequently released on his own recognizance and on
condition of his signing an order of protection relating to
Richard Anglin.  Plaintiff's release on recognizance and the
order of protection required him to remain amenable to the orders
and processes of the court, thus requiring him to remain in the
state.  It is unclear from the record how many times plaintiff
had to return to court after his arraignment, but the Rohman
court concluded that where a plaintiff was required "to return to
court on at least five occasions before the charges against him

35

were ultimately dropped," he had sufficiently implicated the Fourth Amendment to state a claim under § 1983.  <u>Rohman</u>, 215 F.3d at 216.

Plaintiff has also demonstrated that the June 26 prosecution was terminated in his favor.  The case was dismissed pursuant to New York's speedy trial statute, New York Criminal Procedure Law § 30.30, a disposition which constitutes a favorable termination. <u>Rogers v. City of Amsterdam</u>, 303 F.3d 155, 160 (2d Cir. 2002).

The determination of whether probable cause exists to defeat a claim of malicious prosecution must be evaluated at the time of arraignment.  <u>See</u> <u>Posr v. New York State Court Officer</u>, No. 96-CV-5200, 2006 WL 656985, at *12 (E.D.N.Y. Mar. 13, 2006) (Pollak, Mag. J.).  However, unless the authorities became of aware of evidence exonerating the plaintiff between the arrest and the prosecution, probable cause for the arrest is also  "a complete defense to a claim of malicious prosecution." <u>See</u> <u>Rueda v. Kreth</u>, No. 01-CV-2819, 2005 WL 323711, at *5 (E.D.N.Y. Feb. 7, 2005) (quoting <u>Savino v. City of New York</u>, 331 F.3d 63, 75 (2d Cir. 2003)) (internal quotation marks omitted); <u>Posr</u>, 2006 WL 656985, at *13.  Officer Santiago has already demonstrated that she had probable cause to process plaintiff's arrest on June 26, 2001.  Plaintiff has not presented any evidence that Officer Santiago became aware of exonerating facts between the time she processed plaintiff's arrest on June 26 and when she signed the

criminal complaint on June 29.  Accordingly, summary judgment in
Santiago's favor is appropriate on plaintiff's malicious
prosecution claim.

As to the August 16 arrest, plaintiff was released on $1,500
bail.  As with the June 26 arrest, plaintiff's release on bail
sufficiently implicates the Fourth Amendment to state a claim
under § 1983.  The August 16 arrest also concluded in plaintiff's
favor, after the grand jury voted no true bill.  See Bowman v.
City of Middletown, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000)
("[T]he proceeding against Bowman was indisputably terminated in
his favor when the grand jury voted no true bill.").  Here, the
August 16 arrest was privileged by probable cause, and there is
no evidence that Officer Kaifler became aware of exonerating
facts before signing the criminal complaint on August 16, 2001.
Therefore, summary judgment is granted as to the malicious
prosecution claim against Officers Santiago and Kaifler
concerning the June 26 and August 16 arrests.


(5)

**Abuse of Process**

In order for a plaintiff to prevail on a claim for abuse of
process, he must show that the defendant "(1) employ[ed]
regularly issued legal process to compel performance or

37

forbearance of some act (2) with intent to do harm without excuse

of justification, and (3) in order to obtain a collateral

objective that is outside the legitimate ends of the process."

Savino v. City of New York, 331 F.3d at 76 (quoting Cook v.

Sheldon, 41 F.3d at 80) (internal quotation marks omitted).

As discussed above, following his June 26 arrest, plaintiff

was arraigned and subsequently released on his own recognizance.

Plaintiff was also arraigned and released on bail following his

August 16 arrest. "Bringing a defendant before a judge for

arraignment satisfies the first element" of an abuse of process

claim. Shain v. Ellison, 273 F.3d 56, 68 (2d Cir. 2001).

However, probable cause for an arrest and prosecution furnishes

an excuse and justification for employing regularly issued

process. See Golden v. City of New York, ___ F. Supp. 2d ___,

2006 WL 544484, at *6 (E.D.N.Y. March 7, 2006). Summary judgment

is, therefore, appropriate for the abuse of process claim

stemming from the August 16 arrest.

Plaintiff has advanced two theories for what motivated

Officer Linden and Lieutenant White to arrest him and issue legal

process against him on June 26. The first is that they were

retaliating against him for filing a complaint against Officers

Erdman and Miller for the March 1 incident. Retaliation is not

an improper purpose, but rather an improper motive, which is

insufficient to give rise to an abuse of process claim. Savino,

331 F.3d at 77 ("[T]he New York Court of Appeals has made clear
that '[a] malicious motive alone . . . does not give rise to a
cause of action for abuse of process.'") (quoting <u>Curiano v.
Suozzi</u>, 63 N.Y.2d 113, 117, 469 N.E.2d 1324, 480 N.Y.S.2d 466,
468-69 (1984)).  The second theory, stated only in the complaint,
is that they wanted to prevent him from testifying against
Richard Anglin/Simon in Housing Court.  (Compl. ¶ 30
("[D]efendant Linden stated that it was necessary to seize
plaintiff in order to prevent him from giving testimony at the
Housing Court proceeding . . . .")  This would qualify as an
improper purpose.  However, plaintiff has submitted no evidence
to support this theory and has articulated no reason why Officer
Linden had any interest in the Housing Court proceeding.
Accordingly, summary judgment is granted as to the abuse of
process claim for the June 26 arrest.


### (6)

### Assault and Battery

Plaintiff brings claims of assault and battery in regard to
the June 26 and August 16 incidents due to the fact that he was
"handcuffed and forcibly put in a police car."  (Pl.'s Memo. of
Law 21.)  Plaintiff bases his assault and battery claims on the
fact that any unlawful arrest constitutes a cognizable claim for

39

assault and battery.  See id.  Plaintiff is correct in making
this assertion.  See Sulkowska v. City of New York, 129 F. Supp.
2d 274, 294 (S.D.N.Y. 2001) ("If an arrest is determined to be
unlawful, any use of force against a plaintiff may constitute an
assault and battery, regardless of whether the force would be
deemed reasonable if applied during a lawful arrest."); see also
Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 341, 665
N.Y.S.2d 440, 440-41 (2d Dep't 1997).  Because the August 16
arrest was lawful due to the existence of probable cause,
however, this theory of assault and battery must fail.  See
Carter v. City of New York, No. 02-CV-8755, 2004 WL 2181107, at
*13 (S.D.N.Y. Sept. 27, 2004).

    In order for plaintiff to prevail on his claims of assault
and battery during the lawful August 16 arrest, he must show that
the defendants' use of force was "objectively unreasonable,"
considering the perspective of the police officer at the time of
the arrest.  See Lowth v. Town of Cheektowaga, 82 F.3d 563, 573
(2d Cir. 1996); Kramer v. City of New York, No. 04-CV-106, 2004
WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004).  Plaintiff has made
no argument that defendants used unreasonable force, nor can any
such inference be made from the agreed-upon facts.  Plaintiff's
claims of assault and battery must fail regarding the August 16
arrest.

    For the June 26 arrest, however, it remains to be seen

whether probable cause existed.  Thus, plaintiff's assault and battery claims for that arrest will depend, at least in part, upon whether the arrest was lawful, which is a determination that cannot be made upon this record.  See <u>Wyllie v. Dist. Attorney of Kings County</u>, 2 A.D.3d 714, 718-19, 770 N.Y.S.2d 110, 114 (2d Dep't 2003) ("Since an assault and battery cause of action may be based on contact during an unlawful arrest, the questions of fact regarding whether the plaintiff's arrest was supported by probable cause also preclude summary judgment on the cause of action for assault and battery . . . .").  Summary judgment is, therefore, denied as to plaintiff's assault and battery claim against Officer Linden.


### (7)

### Deprivation of Property

Plaintiff claims that he was deprived of his residence and personal property as a result of the March 1, 2001 incident. (<u>See</u> Pl.'s Answering Aff. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Answering Aff.") Ex. R at 1.)  Plaintiff's claim is unavailing, because he must demonstrate that post-deprivation remedies (such as replevin and trespass to chattels) are not available under state law in order to state a due process violation for the random and unauthorized seizure of property

41

under § 1983.  See Alexandre v. Cortes, 140 F.3d 406, 411-12 (2d Cir. 1998).  Because post-deprivation remedies were available under state law, plaintiff's § 1983 claim for deprivation of property must fail.

## (8)

### Criminal Conspiracy

To prove a claim of conspiracy in the context of a § 1983 cause of action, a plaintiff must show:  "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  Conclusory allegations of a conspiracy are inadequate to support a § 1983 claim of conspiracy.  See Dwares v. City of New York, 985 F.2d 94, 99-100 (2d Cir. 1993).  Plaintiff's claim that "[t]he defendants engaged in a criminal conspiracy with a known violent career criminal felon . . . to perpetrate a terror campaign against plaintiff" (Compl. at 27) is vague and not supported by the record.  Plaintiff's claim of conspiracy must fail.

## Conclusion

The defendants' motion for summary judgment is granted in part and denied in part. It is granted as to plaintiff's (1) false arrest claims for the March 1 incident and August 16 arrest; (2) malicious prosecution claims for the March 1, June 26 and August 16 incidents; (3) abuse of process claims; (4) assault and battery claims for the August 16 arrest; (5) deprivation of property claim and (6) conspiracy claim. Defendants' motion for summary judgment on the basis of qualified immunity is granted as to Officer Santiago.

Defendants' motion for summary judgment is denied as to plaintiff's (1) false arrest claims against Officer Linden and Lieutenant White for the June 26 arrest and (2) assault and battery claim against Officer Linden for the June 26 arrest. Defendants' motion for summary judgment on the basis of qualified immunity is denied as to Officer Linden and Lieutenant White.


Dated:      Brooklyn, New York
            March 30, 2006


                           SO ORDERED:


                           _____/s/_____
                           David G. Trager
                           United States District Judge